UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RICHARD WEBBER,
as Special Administrator of the
Estate of Sara J. Schmidt,

              Plaintiff,

           v.                                  Case No. 20-C-1526

ARMSLIST LLC and
JONATHAN GIBBON,

              Defendants.

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION TO TRANSFER AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS

Plaintiff Richard Webber, as special administrator for the estate of his daughter, Sara Schmidt, filed this diversity action against Defendants Armslist LLC and Jonathan Gibbon. The complaint asserts six state law claims against both Defendants—common law negligence, negligence per se, public nuisance, civil conspiracy, wrongful death, a survival action—as well as a claim to pierce the corporate veil against Gibbon. The Court has jurisdiction under 28 U.S.C. § 1332. The case is before the Court on Defendants' motions to dismiss for lack of jurisdiction and failure to state a claim (Dkt. Nos. 5 & 6) and Plaintiff's motion to transfer this case to the Western District of Pennsylvania (Dkt. No. 10). For the following reasons, Defendants' motion to dismiss for lack of personal jurisdiction and Plaintiff's motion to transfer venue are denied. Defendants' motions to dismiss for failure to state a claim, however, will be granted.

## ALLEGATIONS IN THE COMPLAINT

Armslist is an online marketplace for guns. Generally, only licensed firearm dealers, known as Federal Firearms Licensees (FFLs), may sell firearms but only on the condition that various safeguards be taken, such as the completion of a background check on the purchaser and completion of a record of sale. Compl. at ¶¶ 6–7, Dkt. No. 1. However, "occasional" gun sales by private, non-FFL sellers may be transacted without those federal requirements. *Id.* at ¶ 9. Armslist allegedly facilitates these occasional sales between private parties and those who would otherwise be disqualified from owning a firearm under federal or state law. *Id.* at ¶ 13. Plaintiff alleges that Armslist "chose to design and build Armslist.com to allow, enable and assist illegal gun buyers and sellers to buy and sell guns" without investigation into whether purchasers were eligible to purchase a firearm. *Id.* at ¶ 19.

As a result of Armslist's design decisions and business practices, Plaintiff alleges, Schmidt's estranged husband, who was prohibited from owning a firearm under Wis. Stat. §§ 941.29(1m)(g), 813.25 and 18 U.S.C. § 922(g)(8), was able to purchase a firearm from a private seller who listed a firearm for purchase on Armslist.com. Compl. at ¶¶ 141, 147–48. Shortly thereafter, Schmidt's estranged husband used the firearm he purchased from the private seller to fatally shoot Schmidt after Schmidt had arrived at her mother's house to drop off her three children. *Id.* at ¶ 152. Schmidt's estranged husband then committed suicide in the backyard of the house. *Id.* at ¶ 153. Plaintiff alleges that, but for Armslist's failure to enact adequate safeguards, and but for Armslist's conscious decision to design Armslist.com in an irresponsible, unreasonable, and unlawful manner, Sara Schmidt's estranged husband would not have been able to purchase the firearm that he used to kill her. *Id.* at ¶¶ 155–56.

2

**ANALYSIS**

**A. Motion to Transfer**

Plaintiff has moved to transfer the case to the Western District of Pennsylvania, arguing that it is a "more convenient venue for this case to proceed." Dkt. No. 11 at 5. Under 28 U.S.C. § 1404(a), a district court may, "in the interest of justice," transfer an action to another district court "where it might have been brought." When a § 1404(a) motion is filed, a district court "must evaluate both the convenience of the parties and various public interest considerations." *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 62 (2013).

> Factors relating to the parties' private interests include "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive."

*Id.* at 62, n.6 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). In evaluating whether a transfer would be in the interest of justice, "courts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy." *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010) (internal citations omitted). Here, the factors weigh against transferring this case to the Western District of Pennsylvania.

Beginning with the private interest factors, Plaintiff primarily argues it would be more convenient to litigate the case in Pennsylvania because Defendants, potential witnesses, and a significant amount of proof are all located in Pennsylvania. Defendants counter that there are also witnesses in Wisconsin, that Wisconsin-specific discovery may be necessary, and that a significant amount of proof in this case is likely to be electronic, rendering proximity to the proof relatively

3

insignificant. The Court finds that the private interest factors are a wash. Witnesses are located in both districts and the fact that much of the discovery in this case will likely involve electronic information suggests that neither district is in a better position to hear this case. While the Court is sensitive to the proposition that there is a "strong presumption in favor of the plaintiff's choice of forum," *Piper*, 454 U.S. at 255, Plaintiff originally chose to litigate in this forum and waited over three months to file his motion to transfer, *after* Defendants had filed their motions to dismiss. In this same vein, the Court sees no reason to transfer this case to the Western District of Pennsylvania, where it is nearly certain that Defendants will renew their motions to dismiss, thus forcing Plaintiff and Defendants to relitigate the same issue that is pending before this Court.

As to the public factors, the Court finds that these factors weigh against transfer. First, although Plaintiff asserts that the Western District of Pennsylvania disposes of civil matters roughly a month and a half sooner than this district, the Court does not find this to be a sufficient reason for transfer. Second, Plaintiff has asserted claims that arise under Wisconsin law, the state in which this Court sits. This Court's greater familiarity with Wisconsin law weighs heavily against transfer to the Western District of Pennsylvania, where the court will likely have little experience with Wisconsin law. The final two factors, the respective desirability of resolving controversies in each locale and the relationship of each community to the controversy, also weigh against transfer. There is no doubt that there is a strong relationship between the controversy and the community in this case, and there is also no doubt that there is a strong desire to resolve the controversy in Wisconsin, where the tragic death of Schmidt occurred. For these reasons, Plaintiff's motion to transfer this case to the Western District of Pennsylvania is denied.

## B. Motion to Dismiss for Lack of Jurisdiction

Defendants have moved this Court to dismiss the complaint pursuant to Federal Rule of Procedure 12(b)(2) for lack of personal jurisdiction. In a diversity case, such as this one, a federal district court has personal jurisdiction "only if a court of the state in which it sits would have such jurisdiction." *Klump v. Duffus*, 71 F.3d 1368, 1371 (7th Cir. 1995). Personal jurisdiction in Wisconsin involves a two-step analysis under its long-arm statute. Wis. Stat. § 801.05.; *Salfinger v. Fairfax Media Ltd.*, 2016 WI App 17, ¶ 13, 367 Wis. 2d 311, 876 N.W.2d 160. "The long-arm statute is to be construed liberally and in favor of jurisdiction, and the party asserting jurisdiction carries a 'minimal burden of establishing a *prima facie* threshold showing that constitutional and statutory requirements for the assumption of personal jurisdiction are satisfied.'" *Salfinger*, 367 Wis. 2d 311, ¶ 13 (citing *Kopke v. A. Hardtrodt S.R.L.*, 2001 WI 99, ¶ 8, 245 Wis. 2d 396, 629 N.W.2d 662) (internal citations omitted). The first step is to determine whether Defendants are subject to jurisdiction under the statute. *Id.* If the requirements under Wis. Stat. § 801.05 are satisfied, then courts must consider whether exercising jurisdiction comports with the requirements of due process. *Id.* at ¶ 14. "The due process clause will not permit jurisdiction to be based on contacts with the forum that are random, fortuitous, or attenuated." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 426 (7th Cir. 2010). Whether personal jurisdiction is warranted depends on "whether the relationship between the plaintiff's claim and the defendant's contacts with the state made it fair to call the defendant into court there." *Id.* at 427.

The Court has personal jurisdiction over both Armslist and Gibbon. Wisconsin's long-arm statute confers jurisdiction where there was injury to a person within Wisconsin arising out of "an act or omission outside [Wisconsin] by the defendant, provided in addition that at the time of the injury . . . [s]olicitation or service activities were carried on within [Wisconsin] by or on behalf of

the defendant." Wis. Stat. 801.05(4)(a). The complaint alleges that Schmidt was killed by her estranged husband who used the listing services of Armslist.com to illegally purchase a firearm in the State of Wisconsin. This allegation alone may be enough to satisfy the requirement that Armslist provided service activities within the State of Wisconsin, but there are also other allegations in the complaint that illustrate the extent to which Armslist provided services in this state. *See* Compl. at ¶¶ 41, 111–12, 114. Thus, the Court concludes that Wis. Stat. § 801.05(4)(a) confers jurisdiction over Armslist.

The second step, determining whether exercising jurisdiction comports with the requirements of due process, is also satisfied. Although general jurisdiction is inappropriate in this case, "specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010) (citation omitted). In *uBID*, the Seventh Circuit examined whether a court in Illinois could exercise specific jurisdiction over GoDaddy.com, a website with servers in Arizona that registers internet domain names across the country. 623 F.3d at 424. The court rejected GoDaddy's argument that it could not be subject to specific jurisdiction because "its sales in Illinois are merely 'the unilateral activity of Illinois residents' entered into 'at the initiative of the customers.'" *Id.* at 428. The court found that, although it was "true that there is no evidence that GoDaddy specifically targets Illinois customers in its advertising," what mattered was that it had directed its business activities toward Illinois just as it had toward other states. *Id.* It was irrelevant that the transactions were automated; it had hundreds of thousands of customers in Illinois and earned "many millions of dollars annually from

6

Illinois customers;" thus, "[i]ts contacts cannot be fairly described as random, fortuitous, or attenuated." *Id.* at 428–29.

The Seventh Circuit's holding in *uBID* that GoDaddy's sales and customer base in Illinois were sufficient to find specific jurisdiction in Illinois, applies with equal force to this case. Armslist may not have targeted Wisconsin any more than any other state, but it has availed itself of the privilege of conducting business in the state. *Id.* at 424. The complaint alleges sufficient facts to show that Armslist has directed business toward Wisconsin in the same manner it has toward other states, and the alleged volume of that business is significant, not merely random or fortuitous. *See id.* at 428–29. The complaint alleges that Wisconsin is fifth in the United States with respect to the highest number of private sellers on Armslist. *See* Compl. at ¶¶ 65, 112. Those sellers are Armslist's customers and provide most of its revenue. *Id.* at ¶ 64. Given the number of private sellers on Armslist (1.2 million in 2018), the actual number of customers in Wisconsin is likely to be in the tens of thousands, supporting a finding that Armslist has "deliberately engaged in significant activities" in the state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985). Armslist's contention that it did not participate in the alleged transaction is unconvincing. Like GoDaddy, Armslist created its listing system to work precisely in this way, and it cannot now point to its customers in Wisconsin and tell the Court, "[i]t was all their idea." *uBID*, 623 F.3d at 428. Consequently, Armslist is subject to specific personal jurisdiction in Wisconsin.

The Court also has personal jurisdiction over Gibbon. The complaint alleges that Gibbon is responsible for the creation, design, architecture, and continued administration of Armslist.com. Compl. at ¶¶ 2, 21, 74. Again, under Wis. Stat. § 801.05(4)(a), jurisdiction is conferred where there is injury to a person within Wisconsin arising out of "an act or omission outside [Wisconsin] by the defendant, provided in addition that at the time of the injury . . . [s]olicitation or service

7

activities were carried on within [Wisconsin] by or on behalf of the defendant." Gibbon's activities in creating, designing, and administering Armslist.com constitute "an act or omission outside Wisconsin," and Gibbon carried on service activities within Wisconsin, as a result of his continued administration of Armslist.com. The question, then, is whether exercising jurisdiction over Gibbon comports with the requirements of due process.

Again, the Court concludes that it does. Gibbon, in creating, designing, and continuously administering Armslist, as well as collecting the attendant benefits from Wisconsin users who provide Armslist with ad revenue, has purposefully directed his activities toward Wisconsin. It is Gibbon's "willingness to serve and sell to Wisconsin consumers" and his "accrual of benefits from Wisconsin consumers" using his services that make it "reasonable for [Gibbon] to anticipate being haled into a Wisconsin court." *See Thomas v. Ford Motor Co.*, 289 F. Supp. 3d 941, 947 (E.D. Wis. 2017). Gibbon asserts that personal jurisdiction over him "can only be based upon his role as an officer and member of Armslist, LLC." Dkt. No. 5-1 at 12. If this were true, then the Court would not have jurisdiction over Gibbon under *Pavlic v. Woodrum*. 169 Wis. 2d 585, 590, 486 N.W.2d 533, 534 (Wis. Ct. App. 1992) (noting that personal jurisdiction over a corporation cannot be the sole basis for personal jurisdiction over an officer of that corporation). But Gibbon's argument fails because Plaintiff's allegations do not seek to hold Gibbon liable merely because he is a *member* of Armslist, but rather because he *created*, *designed*, *and administers* Armslist.com. An individual may not seek to "shield himself from personal liability for a tort he personally commits or participates in by hiding behind the corporate entity; if he is shown to have been acting for the corporation, the corporation also may be liable, but the individual is not thereby relieved of his own responsibility." *Oxmans' Erwin Meat Co. v. Blacketer*, 86 Wis. 2d 683, 692, 273 N.W.2d 285, 289 (Wis. 1979). The law limits the contractual liability of those who act through

corporations or LLCs, not liability incurred by their own tortious conduct.  It is likewise Gibbon's

own actions that subject him to personal jurisdiction in Wisconsin.  The Court thus concludes that

it has jurisdiction over both Armslist and Gibbon.

### C.  The Communications Decency Act

Having concluded that the Court has jurisdiction over both Defendants, the Court will now

turn to Defendants' argument that the Communications Decency Act (CDA), 47 U.S.C. § 230,

immunizes them from liability.  The Communications Decency Act provides, in relevant part:

> (c) Protection for "Good Samaritan" blocking and screening of offensive material.
>
> > (1) Treatment of publisher or speaker.  No provider or user of an interactive
> > computer service shall be treated as the publisher or speaker of any information
> > provided by another information content provider.
> >
> > (2) Civil liability.  No provider or user of an interactive computer service shall
> > be held liable on account of—
> >
> > > (A) any action voluntarily taken in good faith to restrict access to or
> > > availability of material that the provider or user considers to be obscene,
> > > lewd, lascivious, filthy, excessively violent, harassing, or otherwise
> > > objectionable, whether or not such material is constitutionally protected; or
> > >
> > > (B) any action taken to enable or make available to information content
> > > providers or others the technical means to restrict access to material
> > > described in paragraph (1).

47 U.S.C. § 230(c).  The CDA also provides that "no cause of action may be brought and no

liability may be imposed under any State or local law that is inconsistent with this section."  47

U.S.C. § 230(e)(3).  While courts have grappled with interpreting § 230, the prevailing view among

the Courts of Appeals is that § 230(c)(1) "provides broad immunity from liability for unlawful

third-party content."  *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,

519 F.3d 666, 669 (7th Cir. 2008) (internal quotations omitted) (citing *Zeran v. Am. Online, Inc.*,

129 F.3d 327 (4th Cir. 1997); *Ben Ezra, Weinstein, & Co. v. Am. Online, Inc.*, 206 F.3d 980 (10th

9

Cir. 2000); *Green v. Am. Online*, 318 F.3d 465 (3d Cir. 2003); *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007)).  Applying this broad interpretation, a divided Wisconsin Supreme Court held in *Daniel v. Armslist, LLC*, that § 230 of the CDA barred claims against Armslist for the death of a woman killed in a mass shooting in Brookfield, Wisconsin by a perpetrator who illegally purchased the gun he used from a private seller he found on Armslist's website.  2019 WI 47, 386 Wis. 2d 449, 926 N.W.2d 710.  Of course, the Wisconsin Supreme Court's interpretation of federal law is not binding on this Court.

While other circuits have granted blanket protection under § 230, the Seventh Circuit, whose decisions are binding on the Court, appears to have been less willing to do so.  *See City of Chicago, Ill. v. StubHub!, Inc.*, 624 F.3d 363, 366 (7th Cir. 2010) ("As earlier decisions in this circuit establish, subsection (c)(1) does not create an 'immunity' of any kind." (citing *Doe v. GTE Corp.*, 347 F.3d 655, 660 (7th Cir. 2003)); *see also Craigslist*, 519 F.3d at 669 ("Our opinion in *Doe* explains why § 230(c) as a whole cannot be understood as a general prohibition of civil liability for web-site operators and other online content hosts.").  Indeed, the Seventh Circuit has said that § 230(c)(1) plays a limited role, noting that it merely "limits who may be called the publisher [or speaker] of information that appears online," and while that "might matter to liability for defamation, obscenity, or copyright infringement," that does not necessarily mean it will have a role to play in all cases.  *StubHub!*, 624 F.3d at 366; *see also Huon v. Denton*, 841 F.3d 733, 741 (7th Cir. 2016) ("This means that for purposes of *defamation and other related theories of liability*, a company like Gawker cannot be considered the publisher of information simply because the company hosts an online forum for third-party users to submit comments." (emphasis added)).  Against this backdrop, then, it appears that the Seventh Circuit is not so inclined to employ § 230 as an all-encompassing shield against liability for website operators.

The Seventh Circuit is not alone in its reservations against construing § 230 so broadly. In a statement agreeing with the Supreme Court's decision to deny a writ of certiorari for a Ninth Circuit case denying immunity under § 230 to an internet service provider alleged to have engaged in anti-competitive behavior, Justice Thomas highlighted the issue of "whether the text of this increasingly important statute aligns with the current state of immunity enjoyed by Internet platforms." *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 14 (2020) (Statement by Thomas, J.). Justice Thomas observed that "courts have relied on policy and purpose arguments to grant sweeping protection to Internet platforms," arguably extending § 230 immunity "'far beyond anything that plausibly could have been intended by Congress.'" *Id.* at *15 (quoting 1 R. SMOLLA, LAW OF DEFAMATION § 4:86, at 4-380 (2d ed. 2019)) (internal citations omitted). Justice Thomas questioned various expansions of § 230 immunity, but most pertinent to the case at hand, he specifically questioned the grant of immunity against claims, like this one, that rested on "alleged product design flaws—that is, the defendant's own misconduct." *Id.* at *18. Justice Thomas concluded that

> Paring back the sweeping immunity courts have read into § 230 would not necessarily render defendants liable for online misconduct. It simply would give plaintiffs a chance to raise their claims in the first place. Plaintiffs still must prove the merits of their cases, and some claims will undoubtedly fail.

*Id.*

Setting aside, for a moment, the views of courts and individual judges and justices, the text and purpose of § 230 do not support the broad interpretation of that section upon which Defendants' motion relies. Congress's intent has been plainly spelled out in a variety of reports. For example, Congress has stated that § 230

> provides 'Good Samaritan' protections from civil liability for providers or users of an interactive computer service for actions to restrict or to enable restriction of access to objectionable online material. One of the specific purposes of this section

11

is to overrule *Stratton-Oakmont v. Prodigy* and any other similar decisions which have treated such providers and users as publishers or speakers of content that is not their own because they have restricted access to objectionable material. The conferees believe that such decisions create serious obstacles to the important federal policy of empowering parents to determine the content of communications their children receive through interactive computer services.

H.R. Rep. No. 104-458 at 194. In *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), an online bulletin board was held liable as a publisher for anonymous online postings claiming that Stratton Oakmont had behaved fraudulently, in part because it had attempted to remove content that was offensive or in bad taste. Congress enacted the CDA largely in response to this decision. But even setting aside the tricky task of discerning legislative intent, it is the text of the statute from which a court should draw its true meaning. Subsection (c) is entitled "protection for 'good samaritan' blocking and screening of offensive material." As the Seventh Circuit has noted, this title is "hardly an apt description if its principal effect is to induce ISPs to do nothing about the distribution of indecent and offensive materials via their services." *Doe*, 347 F.3d at 660. Furthermore, nothing in the text of § 230(c)(1) indicates an intent to provide sweeping immunity for providers or users of interactive computer services who face claims based on their own misconduct. The section merely states that a provider of an interactive computer service shall not be treated as the publisher or speaker of any information provided by a third-party and, as mentioned above, seeks to remedy the type of issue that arose in *Stratton Oakmont*.

Plaintiff's claims are not the kinds of claims to which § 230 by its plain language applies. In *StubHub!*, the Seventh Circuit noted that § 230(c)(1) merely "limits who may be called the publisher of information that appears online," and while that "might matter to liability for defamation, obscenity, or copyright infringement," that does not mean it will be appropriate elsewhere. 624 F.3d at 366. The Seventh Circuit further reiterated this position in *Huon*, where

the court noted that § 230(c)(1) applies "for purposes of defamation and other related theories of liability." 841 F.3d at 741. In this case, the Court does not have claims for defamation, obscenity, copyright infringement, or some other related theory of liability before it, but instead claims sounding in negligence and public nuisance based on Defendants' affirmative conduct. It thus appears that § 230 is not even relevant to this case.

But even if § 230 applies to this type of case, Plaintiff's claims do not seek to treat Defendants as the "publisher or speaker" of the post in question. Here, Plaintiff seeks to hold Defendants liable for their "role in developing or co-developing [their] own content." Dkt. No. 13 at 18. Specifically, Plaintiff faults Defendants for failing to prohibit criminals from accessing or buying firearms through Armslist.com; actively encouraging, assisting, and facilitating illegal firearms transactions through their various design decisions; failing to require greater details from users, such as providing credit-card verified evidence of users' identities; failing to require that sellers certify under oath that they are legal purchasers; and failing to provide regularly updated information regarding applicable firearms laws to its users, among many other things. Compl. at ¶ 165. In essence, the complaint "focuses primarily on Armslist's own conduct in creating the high-risk gun market and its dangerous features," not on the post in question. Dkt. No. 13 at 23. This type of claim, then, does not seek to treat Defendants as the "publisher or speaker" of the post that led to Schmidt's killer obtaining a firearm; rather, it seeks to hold Defendants liable for their *own misconduct* in negligently and recklessly creating a service that facilitates the illegal sale of firearms. 47 U.S.C. § 230(c)(1). For these reasons, the Court concludes that § 230 does not immunize Defendants from liability in this case.

13

### D. Motion to Dismiss for Failure to State a Claim

Defendants also move for dismissal of the complaint for failure to state a claim for relief under Rule 12(b)(6). They contend that the complaint fails to allege facts showing Plaintiff is plausibly entitled to relief under Wisconsin law. The complaint asserts six claims for relief. The Court will address each in turn.

The first claim for relief in the complaint is for common law negligence. In *Vesely v. Armslist LLC*, the Seventh Circuit affirmed the district court's dismissal of a claim of negligence arising under similar facts for failure to state a claim under Illinois law. 762 F.3d 661 (7th Cir. 2014). In that case, a rejected suitor illegally purchased a firearm from a person who advertised on Armslist and used it to shoot and kill the woman who rejected him. The woman's brother brought suit against Armslist, alleging that Armslist's negligence in facilitating the sale caused his sister's death. The district court granted Armslist's Rule 12(b)(6) motion to dismiss on the ground that Armslist owed no duty to the plaintiff's sister, an essential element under Illinois law. *Id.* at 664. The Seventh Circuit affirmed based on the "universally accepted rule . . . that a private person has no duty to act affirmatively to protect another from criminal attack by a third person absent a special relationship between the parties." *Id.* at 665 (quoting *Iseberg v. Gross*, 227 Ill. 2d 78, 316 Ill. Dec. 211, 879 N.E.2d 278, 284 (2007)). The court found that no special relationship between the victim and Armslist existed. The court also rejected the plaintiff's contention that Armslist had assisted the assailant in his plan to kill his sister, noting "simply *enabling* consumers to use a legal service is far removed from encouraging them to commit an illegal act." *Id.* at 666.

Of course, *Vesely* is not controlling here, since this case arises under Wisconsin negligence law which differs from the law of Illinois. There are four elements to a claim for negligence under Wisconsin law: "(1) the existence of a duty of care on the part of the defendant, (2) a breach of

14

that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the injury." *Gritzner v. Michael R.*, 2008 WI 98, ¶ 19, 235 Wis. 2d 781, 611 N.W.2d 906. Wisconsin, unlike Illinois, however, has abandoned the "no duty-no liability concept of the majority in *Palsgraf* . . . ." *A. E. Inv. Corp. v. Link Builders, Inc.*, 62 Wis.2d 479, 483, 214 N.W.2d 764, 766 (1974) (citing *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928)). The first element, a duty of care, is established under Wisconsin law whenever it was foreseeable to the defendant that his or her act or omission to act might cause harm to some other person." *Gritzner*, 235 Wis. 2d 781, ¶ 20. In other words, under Wisconsin law, "[a] defendant's duty is established when it can be said that it was foreseeable that his act or omission to act may cause harm to someone." *Id.* The second element of a claim for negligence is simply a breach of that duty, i.e., the failure to use due care:

> A person is negligent when [he or she] fails to exercise ordinary care. Ordinary care is the care which a reasonable person would use in similar circumstances. A person is not using ordinary care and is negligent, if the person, without intending to do harm, does something (or fails to do something) that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property.

*Id.* at ¶ 22 (quoting Wis JI—Civil 1005).

The complaint in this case alleges sufficient facts to satisfy the first, second, and fourth elements. The complaint alleges that Defendants (1) knew criminal gun buyers and sellers frequently exploit a legal loophole allowing "occasional" gun sales by private sellers that skirt state and federal regulations; (2) knew in 2018 that Armslist.com was facilitating illegal and reckless sales by unlicensed sellers and purchases by prohibited possessors; and (3) specifically created and designed their website to capitalize on this illegal gun market opportunity after other companies offering similar services abandoned it. Compl. at ¶¶ 7–20. In essence, the complaint alleges that Defendants knew, or should have known, that their conduct created an unreasonable

risk of harm to the community at large but nevertheless continued to engage in that conduct for profit. Indeed, the complaint specifically alleges that Defendants had notice that their website was being used by prohibited persons to obtain firearms to carry out brutal murders. *See id.* at ¶¶ 114–17 (noting similar incidents that occurred in Brookfield, Wisconsin and in Oak Brook, Illinois). And there is no dispute that the estate suffered an injury—the loss of the life of Sara J. Schmidt. The question of whether Defendants' conduct caused such a loss, however, is closer.

"The test of cause in Wisconsin is whether the defendant's negligence was a substantial factor in contributing to the result." *Merco Distrib. Corp. v. Commercial Police Alarm Co., Inc.*, 84 Wis. 2d 455, 458, 267 N.W.2d 652, 654 (1978). A substantial factor need not be the sole factor or even the primary factor. *Schnabel v. Ford Motor Co.*, 54 Wis. 2d 345, 353–54, 195 N.W.2d 602, 607 (1972). Whether a person's negligence was a cause of an injury is a factual question for the jury to decide unless reasonable people could not disagree on the question. *Morgan v. Pa. Gen. Ins. Co.*, 87 Wis. 2d 723, 735–36, 275 N.W.2d 660, 666 (1979).

Here, Defendants' conduct is somewhat removed from the injury alleged. The complaint alleges that Sara Schmidt was murdered by her estranged husband with a handgun he purchased from a private seller whose advertisement for the gun he saw on Armslist's website. Compl. at ¶¶ 145–54. The complaint alleges that "Sara's killer would never have had the Armslist Handgun on January 9, 2018—and Sara would still be alive—if Armslist had been responsible, reasonable and lawful in how it designed and administered Armslist.com and not contributed to illegal firearms transactions." *Id.* ¶ 155. The claim that Schmidt would still be alive but for Armslist's website is, of course, a conclusion that need not be accepted by the court, even at the pleading stage. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare

16

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Given the allegations of the complaint, it is also not a very plausible conclusion.

It is clear from the complaint that Schmidt was shot and killed by her estranged husband, not Defendants, with a handgun he purchased from another party, again not Defendants. Based on the facts alleged, there is no reason to believe that even if Schmidt's estranged husband had not purchased a gun from a person who posted an advertisement on the Armslist website, Schmidt would still be alive. Armslist is hardly the only source of guns in this country, and one does not even need a gun to take another person's life. Schmidt was killed by a person so determined to take her life, so consumed by hatred, that he was even willing to take his own. The likelihood that such a person would have found another source from which to obtain a firearm or another way to take Schmidt's life is more plausible than Plaintiff's claim that she would still be alive. Absent cause, Plaintiff's negligence claim against Defendants fails. But even if Plaintiff's complaint did state a plausible claim for negligence, the result would be the same.

Under Wisconsin law, even when a negligence action is properly pled and all of the elements of the cause of action met, liability may be limited as a matter of law where considerations of public policy require dismissal of the claim and relieve the defendant of liability in a particular case. *See Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 654, 517 N.W.2d 432, 443 (1994); *Peters v. Menard*, 224 Wis. 2d 174, 193, 589 N.W.2d 395, 405 (1999). Wisconsin courts have identified six factors that may operate to preclude liability:

> (1) the injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tortfeasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance for recovery would enter a field that has no sensible or just stopping point.

17

*Casper v. Am. Int'l S. Ins. Co.*, 2011 WI 81, ¶ 94, 336 Wis. 2d 267, 800 N.W.2d 880. "A court may find that liability is precluded on the basis of any one of these factors." *Id.* at ¶ 95. And while the Wisconsin Supreme Court has noted that, as a matter of practice, it is sometimes better to refrain from a public policy consideration of liability until after a trial of the facts, a court may make a public policy determination without requiring a more complete record where the facts presented are simple to ascertain and the public policy questions have been fully presented. *Hornback v. Archdiocese of Milwaukee*, 2008 WI 98, ¶ 51, 313 Wis. 2d 294, 752 N.W.2d 862 (citing *Alvarado v. Sersch*, 2003 WI 55, ¶ 18, 262 Wis. 2d 74, 662 N.W.2d 350); *see also Casper*, 336 Wis. 2d 267, ¶¶ 92–93.

Of course, the question whether public policy would preclude liability for common law negligence under the circumstances of this case is a question of Wisconsin law. "When interpreting state law, a federal court's task is to determine how the state's highest court would rule." *Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011). If the state's supreme court has not yet addressed the issue, the federal court should "consult and follow the decisions of intermediate appellate courts" to predict how the supreme court would act given the chance, unless "there is a convincing reason to predict the state's highest court would disagree." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). And absent "any authority from the relevant state courts, [the federal court] . . . shall examine the reasoning of courts in other jurisdictions addressing the same issue and applying their own law for whatever guidance about the probable direction of state law they may provide." *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007).

In *Daniel*, the Wisconsin Supreme Court found the plaintiff's claims against Armslist were barred under the CDA and thus did not reach the question of whether the complaint otherwise

stated a claim of negligence. 386 Wis. 2d 449, ¶ 51. Although the Wisconsin Court of Appeals held that the CDA did not bar plaintiff's claim in *Daniel*, it likewise did not address the issue of whether the complaint otherwise stated a claim for negligence. 2018 WI App 32, ¶ 28, 382 Wis. 2d 241, 913 N.W.2d 211. The Wisconsin Court of Appeals did, however, address that issue in a similar case. *Olson v. Ratzel*, 89 Wis. 2d 227, 278 N.W.2d 238 (Ct. App. 1979). In *Olson*, the plaintiff sued a licensed firearm dealer whose employee had illegally sold a firearm to a minor who later shot him with the weapon. The court affirmed the trial court's denial of the defendant's motion to dismiss, holding that the complaint stated a common law negligence claim against the firearms dealer and that the trial court had not erred, at least at that stage of the proceeding, in holding that liability was not barred by public policy. *Id.* at 251–54. *Olson* is distinguishable from this case, however, in that Armslist did not illegally sell the gun in question. And, of course, this Court is not bound by the state court of appeals' decision in any event.

Here, the Court concludes that Wisconsin's public policy bars this suit. Because the injury Plaintiff suffered is too remote from and out of proportion to Defendants' conduct and allowing recovery in this case would place an unreasonable a burden on Defendants. Although intentional criminal acts "are not a superseding cause per se," "acts that are either criminal or intentionally tortious . . . are more likely to be adjudged superseding causes than merely negligent acts." *Scottsdale Ins. Co. v. Subscription Plus, Inc.*, 299 F.3d 618, 620 (7th Cir. 2002) (citing *Tobias v. Cty. of Racine*, 179 Wis. 2d 155, 161–63 507 N.W.2d 340, 342–43 (Ct. App. 1993)). In this case, after purchasing a firearm from a private party based on an advertisement he saw on Armslist.com, Schmidt's killer used the gun to commit an abhorrent and tragic crime. Whatever role Defendants may have played prior to Schmidt's tragic murder, the Court concludes that the conscious, pre-meditated decisions and actions of Schmidt's killer served as a superseding cause of Plaintiff's

19

injury.  True, Defendants may have owned and operated the website used by Schmidt's killer to obtain the firearm utilized in Schmidt's murder, but lawfully providing a forum for individuals to engage others interested in buying and selling firearms is simply too far removed from and out of proportion to the criminal act committed by Schmidt's killer.  "[S]imply *enabling* consumers to use a legal service is far removed from encouraging them to commit an illegal act."  *Vesely*, 762 F.3d at 666.

Imposing civil liability on Defendants for Schmidt's murder is also out of proportion to the lawful conduct in which they engaged and would likely destroy their business.  Indeed, the latter might be Plaintiff's goal.  This case, and many like it, represent a nationwide effort to use litigation as a way of circumventing the legislative process in the area of gun control.  *See* Timothy D. Lytton, *Lawsuits Against The Gun Industry: A Comparative Institutional Analysis*, 32 CONN. L. REV. 1247 (2000).  But determining public policy based on one tragic set of circumstances is not the proper function of courts or juries.  To be sure, there may be good reasons to prohibit websites, such as Armslist, that connect private gun sellers with gun buyers, some of whom are intent on violating federal and state laws prohibiting certain individuals from owning or possessing guns. In a government such as ours, however, public policy is more properly determined by the peoples' elected representatives rather than by the courts.  The legislative process allows a full airing of all possible reasons both for and against a proposed policy and the potential consequences of adopting it.  A single lawsuit focused on the tragic loss of a young woman's life does not.

The Court thus concludes that, as to his negligence claim, Plaintiff has failed to allege adequate facts showing the element of causation.  Furthermore, even if the Court were to conclude that Plaintiff had made an adequate showing of cause, the Court would still dismiss the complaint on public policy grounds, primarily because Defendants' alleged negligence is too remote from

the injury suffered by Plaintiff, or in other words, the actions of Schmidt's killer constituted a superseding cause, alleviating Defendants of liability.

This conclusion is fatal to Plaintiff's remaining claims. Plaintiff's claims for negligence per se and civil conspiracy must be dismissed, since they suffer from the same failure to plausibly allege a causal relationship between Defendants' alleged conduct and Schmidt's death and are subject to the same public policy considerations. Plaintiff's third claim is one for public nuisance under Wisconsin law. However, "[p]roof that the underlying conduct was tortious is necessary to liability predicated on nuisance." *Butler v. Advanced Drainage Sys., Inc.*, 2006 WI 102, ¶ 29, 294 Wis. 2d 397, 717 N.W.2d 760. Because the Court concludes that Plaintiff has failed to adequately state a claim for negligence, no showing of tortious conduct has been made, and the public nuisance claim must be dismissed.

Plaintiff's fifth and sixth claims, a wrongful death action and a survival action, must also be dismissed. This is because both claims require that an underlying tort be committed before such an action be brought. *See Christ v. Exxon Mobil Corp.*, 2015 WI 58, ¶¶ 19, 21, 362 Wis. 2d 668, 866 N.W.2d 602 (noting that "damages for injuries sustained by a *tort victim* prior to [her] death now survive in what is known as a survival action" and "certain relatives of *tort victims* are now also able to bring actions for wrongful death" (emphasis added)). Therefore, because Plaintiff has failed to plead facts to make it plausible that a tort was committed, these claims must be dismissed.

Finally, Plaintiff's seventh claim to pierce the corporate veil against Gibbon will be dismissed. Since the direct claims against Armslist fails, the rationale for piecing the corporate veil evaporates. Armslist has no corporate liability to impose on Gibbon. Even aside from this problem, Plaintiff asserts nothing more than legal conclusions, namely that Armslist LLC is the

"alter-ego" of Gibbon and that, "upon information and belief, Armslist LLC is not appropriately capitalized and does not follow corporate formalities." Compl. at ¶¶ 224–25. Although the Court is sensitive to the fact that some of these factors are more properly analyzed after discovery, the Court cannot ignore the Supreme Court's command that Plaintiff must plead "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, count seven of Plaintiff's complaint must be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to transfer (Dkt. No. 10) is **DENIED**. Furthermore, Defendants' motions to dismiss (Dkt. Nos. 5 & 6) are **GRANTED-IN-PART** and **DENIED-IN-PART**. The Court concludes that it has jurisdiction over Defendants, but that Plaintiff has failed to state a claim upon which relief may be granted. This case is therefore dismissed, and the Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 9th day of November, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge